General Dyestuff Corp. v. United States (No. 3573)[1]

[1] 46409.

United States Court of Customs and Patent Appeals, April 24, 1933

*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*Thomas J. McKenna*, special attorney of counsel), for the United States.

[Oral argument December 6, 1932, by Mr. Brown and Mr. McKenna]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

This is an appeal by General Dyestuff Corp. from a judgment of the United States Customs Court holding certain merchandise, consisting of a coal-tar product, or color, named "alizarine direct blue RXO," to have been properly assessed for duty by the collector of customs at 7 cents per pound and 45 per centum ad valorem under the provisions of paragraph 28 of the Tariff Act of 1922, "the duty being on two times the weight of the merchandise in aoccrdance with the standard proclaimed in T. D. 40192."

The protest of the importer is leveled against the assessment of the specific duty on two times the weight of the merchandise, its claim being that "the imported color should have been assessed with specific duty on the basis of only its actual net weight as imported, not two times the net weight." There is no contest as to the ad valorem duty of 45 per centum, nor as to so much of the specific duty of 7 cents per pound as was based upon the actual landed net weight of the imported merchandise.

The general duty upon coal-tar colors of 45 per centum ad valorem plus 7 cents per pound, under the Tariff Act of 1922, is provided by the first portion of paragraph 28 thereof. That paragraph has a number of provisos, the third of which, in so far as here pertinent, reads:

*Provided,* That the specific duty of 7 cents per pound herein provided for on colors * * * shall be based on standards of strength which shall be established by the Secretary of the Treasury, and that upon all importations of such articles which exceed such standards of strength the specific duty of 7 cents per pound shall be computed on the weight which the article would have if it were diluted to the standard strength, * * *.

The pertinent portion of the sixth proviso reads:

*Provided further,* That in the enforcement of the foregoing provisos in this paragraph the Secretary of the Treasury shall adopt a standard of strength for each dye or other article which shall conform as nearly as practicable to the commercial strength in ordinary use in the United States prior to July 1, 1914; * * * that if a dye or other article was or is ordinarily used in more than one commercial strength, then the lowest commercial strength shall be adopted as the standard of strength for such dye or other article; * * *.

It is a matter of common knowledge that during and following the World War various efforts, legislative and otherwise, were put forth directed to the establishment and maintenance of new dye industries in the United States. Title V of the Emergency Tariff Act of 1921, said title being designated "Dye and Chemical Control Act, 1921," had that purpose in view, and paragraph 28 of the Tariff Act of 1922 was directed almost wholly to that end.

On August 14, 1923, there was issued from the Treasury Department T. D. 39765, which, on May 17, 1924, was superseded by T. D. 40192, 45 Treas. Dec. 588. The latter Treasury decision is the one here involved. It purports to establish standards of strength in accordance with the requirements of the provisos, *supra,* of said paragraph 28 of the Tariff Act of 1922.

The said Treasury decision bears the general title "Standards of strength of imported coal-tar dyes." There are given "Key to class index abbreviations" and "Key to abbreviations of names of manufacturers." These are followed by a "List of standards" in which 469 different colors or dyes are named as standards by which other specifically named colors or dyes are to be measured for tariff purposes.

We quote from the Treasury decision, in the arrangement there given, the part which is here pertinent:

| No. | Class index | Name of standard | Manufacturer | Partial list of trade names of imported products commercially identical with each standard | Manufacturer |
|-----|-------------|------------------|--------------|---------------------------------------------------------------------------------------------|--------------|
| 190 | S. 859<br>C. 1076 | Cyananthrol R ——. | (B) ——. | Alizarine direct blue RXO ——. | (B). |

"S. 859," appearing in the "Class index" column, *supra*, is meant to show (as stated in the key) that cyananthrol R appears as No. 859 in a publication by Schultz, while "C. 1076" shows that it is listed as No. 1076 in another publication known as "Color Index," edited, as we understand, by F. M. Rowe.

Both these publications were at the time of the issuance of T. D. 40192, and are now, works recognized as standard in the dye industry, and hence judicial notice may be taken of them. *United States* v. *Davies, Turner & Co.*, 16 Ct. Cust. Appls. 50, T. D. 42719. "(B)" in the fourth column, under the heading "Manufacturer," shows, according to the "key," that cyananthrol R is manufactured by a certain German manufacturer. The "(B)" in the last column shows that the dye, known by the trade name of "Alizarine direct blue RXO," is manufactured by the same company which is listed as the manufacturer of cyananthrol R. The statement at the top of the fifth column conveys the information that alizarine direct blue RXO is commercially identical with cyananthrol R. Both cyananthrol R and alizarine direct blue RXO are commercial or trade names.

As we understand the matter, the Treasury Department construed the "standards of strength" provisions of paragraph 28, *supra*, to mean standards of *tinctorial* strength, and T. D. 40192 was issued under the theory that such was the intent of Congress. The brief for appellant treats the T. D. 40192 standard as being of this character, as does that for the Government.

"Tinctorial" pertains or relates to color or hue. See Webster's and Funk & Wagnalls' dictionaries. From the definitions there given and from other recognized authorities, such as Hackh's Chemical Dictionary, Kingzett's Chemical Encyclopedia, Thorpe's Dictionary of Applied Chemistry, and similar works, we conclude that tinctorial strength may be defined as the degree of intensity of the color imparted to a dyed article. See particularly chapter 29, at page 666, of Matthews, "Application of Dye Stuffs," edition 1920.

In the case at bar the basis of assessment was evidently reached by determining the amount of dilution essential to be made of the imported product in order to obtain the same hue or degree of color as is obtained from cyananthrol R.

The Treasury decision at issue declares no other color as a standard of strength for cyananthrol R, but, as hereinafter stated, the formula for it is given in "Color index," referred to in said Treasury decision. Appellant challenges the legal sufficiency and validity of this, and insists that a "color standard" is not the "standard of strength" which the statute involved contemplates shall be established by the Secretary of the Treasury.

Generally speaking, appellant's contention is that Congress contemplated the establishment of "standards of strength," declaring

"exactly the percentage of pure dye content" in each dye, "expressed in numerical terms, 100%, 75%, 50%, as the case may be, whatever was the strength in ordinary use in the United States prior to July 1, 1914," and that T. D. 40192 is invalid because it took tinctorial strength rather than pure dye content as the standard. A condensed statement of all of appellant's grounds of objection is contained in his brief as follows:

(1) T. D. 40192 is illegal and of no effect as far as this case is concerned, because it does not establish a standard *of strength* with which the imported strength of the color at bar is to be compared for the purposes of assessing the specific duty. Another color is named as a standard for the imported color, but nothing whatever is said about its strength. The law contemplates not the establishment of a color standard, but the establishment of a strength standard. Even if it be lawful to name another color as a standard for the imported color, the strength of the standard must be specified. (Italics quoted.)

(2) T. D. 40192 is illegal and void in that it adopts a different color as a standard for the imported color, instead of establishing the standard strength of the imported color itself. Under the plain wording of the law it would have been necessary not to name another color as a standard for the imported color but to state the percentage of strength of the imported color which was in ordinary use in the United States prior to July 1, 1914, or, if introduced into commercial use since that date, then the percentage of strength in ordinary contemporary use.

(3) Even if a proper standard *of strength* had been adopted in T. D. 40192, the adoption was illegal because it was the act of McKenzie Moss, Assistant Secretary of the Treasury, and not the act of the Secretary of the Treasury. It is claimed that Par. 28 makes the adoption of standards of strength the duty of the Secretary of the Treasury and that he has no power to re-delegate his authority in the premises so that even if the Secretary of the Treasury actually ordered the Assistant Secretary to adopt standards of strength the action of the Assistant Secretary would be a nullity under the statute. Of course, it is not contended that the preliminary work of investigation should not be done by subordinates, but the law clearly contemplates that the actual adoption of the strength standard must be the act of the Secretary of the Treasury himself. After his subordinates have done the necessary work, he himself must establish the strength standard for each color. (Italics quoted.)

The third ground, *supra*, presents a question quite analogous to that brought before this court in the case of *United States* v. *Central Vermont Railway Co.*, 17 C. C. P. A. (Customs) 166, T. D. 43474, the prevailing opinion in which holds that an antidumping order signed by an Assistant Secretary of the Treasury, under section 201 (a), Antidumping Act of 1921, will be presumed to have been authorized by the Secretary of the Treasury and to have been within the scope of the duties of the Assistant Secretary.

The principle of that decision is regarded as controlling in the case at bar. No authorities are here cited which were not considered when that case was being determined, and the reasoning of appellant here is the same as that which was then presented by the appellee in that case.

Neither party to the case at bar saw proper to take testimony relative to prevailing and past practices and customs among manufacturers of, and dealers in, coal-tar products. In view of the highly technical character of the dye industry it might have aided the courts materially had this been done.

It seems not improper to say that the heretofore prevailing theory has apparently been that standards of tinctorial strength were the standards contemplated by the Congress.

Paragraph 28 of the Tariff Act of 1922 contains the following:

All colors, * * * 45 per centum ad valorem based upon the American selling price * * * of any similar competitive article manufactured or produced in the United States, and 7 cents per pound: *Provided*, That * * *. If there is no similar competitive article manufactured or produced in the United States, then the ad valorem rate shall be based upon the United States value, * * *. For the purpose of this paragraph any coal-tar product provided for in this Act shall be considered similar to or competitive with any imported coal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner * * *.

The foregoing portion of the stated paragraph was before this court for construction in the cases of *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 412, T. D. 41054, and *Metz & Co. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 412, T. D. 41340. These were reappraisement cases and, in both, this court treated tinctorial strength as being the strength required, by the statute; that is to say, the "results" referred to in the paragraph were considered to mean tinctorial results, as "tinctorial" has been herein defined, *supra*.

No question was made in those cases as to the proper meaning of "standards of strength." Hence what was there said upon the subject matter is not here controlling, but the cases are cited as evidencing the fact that tinctorial strength was there regarded and treated as the legal standard for comparing the results accomplished by the dyes.

As we view the matter, a presumption of correctness applies to the official acts of the Secretary of the Treasury in carrying out the mandate of the Congress, and, in this case, we are unable to see whereby this presumption of correctness may be overcome except by proofs of usage in the trade which would show that, according to such usage, T. D. 40192 was not a compliance with the statute.

Such proofs are lacking and appellant relies solely upon argument.

It seems to us that the question here presented is more a question of fact than of law. The statute involved does not contain the word "tinctorial," nor does it refer in any way to percentages nor use the phrase "pure dye content" or any similar phrase. The only adjective relating to strength which the paragraph uses is "commercial." So far as this court is advised from the record, there might be either a tinctorial commercial strength or a "pure dye content" commercial strength. Whether this is true as a fact we have no evidence to show.

The Treasury decision uses tinctorial strength as a basis; appellant argues that pure dye content should constitute the basis. We do not regard it as proper for the court, without any proofs that T. D. 40192 does not conform to the usage and custom of the trade, to set it aside and arbitrarily establish another standard not itself shown to be in conformity with the commercial practice.

There is not only nothing in the record before us to show that it was the practice in 1914, or at the time of the passage of the Tariff Act of 1922, to test dyestuffs solely upon the basis of pure dye content, but nothing appears to prove that such standards would be possible or practicable.

It is argued on behalf of appellant that as to certain items in T. D. 40192 percentages are named. This is true. For example, item No. 320 names as the standard for a dye having the trade name of "indanthrene blue-green B pastes and powder," the dye known as "indanthrene blue-green B 12½% paste." But we do not understand this to mean that tinctorial strength is there abandoned and a standard expressed in numerical terms, giving pure dye content, substituted therefor. Rather it means that the standard of tinctorial strength for indanthrene blue-green B, in both paste and powder form (the only forms in which merchandise such as that at issue is imported) is the tinctorial strength of indanthrene blue-green B 12½ per centum paste, which latter tinctorial strength had and has a definite and well-known meaning or status, as shown in the intensity of color which its application produces in the article dyed by it.

Another argument for appellant is based upon the requirement that a standard is to be established "for each dye." It is insisted that the proper interpretation of this expression is that the strength of each dye imported must be numerically expressed.

We are unable to agree with this contention. Upon the contrary, as we understand it, the specific dyes named as standards had and have known tinctorial strengths and are capable of being used as standards by which to determine the tinctorial strengths of the respective dyes which are to be measured by them.

Confining ourselves to the specific examples before us in the instant case, it is to be assumed that the particular dye known by the trade name of cyananthrol R was and is a product whose tinctorial strength was and is known. The color index publication, alluded to in the Treasury decision at issue, as a matter of fact, gives the discoverer of this dye the complete formula by which it is prepared, its scientific name, and describes its appearance, application, and uses. The statement of the Schultz publication is in the German language, and, while not so elaborate as that appearing in Color Index, seems to correspond with the latter upon all material points.

This product whose qualities and characteristics were so known was established as the standard for the product known by the trade name of alizarine direct blue RXO. The particular alizarine direct blue RXO, which was here imported, being tested by its standard, was found to be tinctorially stronger than the standard to an extent which required its dilution to produce the same hue. It so happened that in this particular instance the extent of dilution necessary to produce the same depth or intensity of hue as that produced by the standard was such as to make the diluted product double the weight of the product imported.

Further argument in support of appellant's contention is based upon that portion of the sixth proviso, *supra*, of paragraph 28, which declares:

* * * if a dye * * * was or is ordinarily used in more than one commercial strength, then the lowest commercial strength shall be adopted as standard of strength for such dye * * *.

The effect of this argument is that there can not be more than one *tinctorial* strength in a dye produced by a fixed formula, and that the Congress in speaking of "more than one *commercial* strength" must have had in mind something other than tinctorial strength. Appellant insists that this was the percentage of pure dye content in the dye ordinarily commercially used. (Italics ours.)

While a certain plausibility may be conceded to this argument, we are not convinced that appellant's construction of the language quoted is the correct one.

It is our opinion that the word "dye" is used in paragraph 28 in a somewhat generic sense. The paragraph does not undertake to provide for the articles covered by it by their trade names. It is well known that there are literally thousands of forms of coal-tar dyes; that new products are being constantly developed by changes in formulas and mixtures, and that the industry is constantly undergoing evolution by experimentation and by the introduction of new processes, or new chemical formulas. New trade names for the new forms of dyes are being also constantly applied.

It should also be said that, in our opinion, "colors" is used in the paragraph as the name of an article and not as descriptive of an article.

It is scarcely reasonable to suppose that Congress by the phraseology of paragraph 28 of the Tariff Act of 1922 intended that the trade names of dyes should govern, or that when "dye" or "color" is used it means simply a product having some particular trade designation.

Rather the presumption is that prior to July 1, 1914, certain dyes known by specific trade names were recognized as standard in tinctorial strength. For example, cyananthrol R. It, we must assume, had a determined and known tinctorial strength. Since it was and

is the product of a given formula it had and has only one tinctorial strength, but cyananthrol R is only one commercial form of a particular dye or color.  Others, according to standard authorities already alluded to, *supra*, are or may be formed from the same general bases and these may have a greater or less tinctorial strength than cyananthrol R.  Ordinary commercial strength must have reference to the strength which the articles have as ordinarily sold.

In that sense a dye in different forms, and sold under different trade names, had different commercial strengths, although a particular named form of that dye made from a specific formula has just one tinctorial strength.  Whenever it occurs that there are different commercial strengths, the statute requires that there be taken as the standard the form lowest in strength which is ordinarily commercially used. Upon this record we feel that this must be held to mean "lowest tinctorial strength."

It is to be noted that the necessity for the standards of strength arises only out of the fact that dyes may be imported of different strengths, because a minimum specific duty of seven cents per pound is fixed upon all dyes covered by the paragraph.  If the imported product falls below the standard in strength, it still pays this minimum.  It is affected as to duty only when it exceeds the standard in strength.

It is our opinion that under the presumption of correctness attaching to T. D. 40192, we must conclude that cyananthrol R was and is the lowest tinctorial strength of the dye involved ordinarily used in commerce, and that it was the proper standard of strength for the merchandise imported.

The judgment of the United States Customs Court is *affirmed*.